IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CV-41

LAMAR IRON HORSE, )
)
Plaintiff, ) **COMPLAINT**
)
vs. ) **(JURY TRIAL DEMANDED)**
)
DENIS R. MCDONOUGH, Secretary, )
U.S. Department of Veterans Affairs, )
)
Defendant. )
_____ )

Plaintiff, complaining of the Defendant, hereby alleges and says as follows:

## **INTRODUCTION**

This is an employment discrimination action to recover back pay, front pay,

compensatory damages and equitable relief as remedies for the blatant violation of

Plaintiff Lamar Iron Horse's rights under the Rehabilitation Act and Title VII of the

Civil Rights Act of 1964.

## **PARTIES, JURISDICTION and VENUE**

1.      Plaintiff Lamar Iron Horse is a citizen and resident of Fayetteville,

Hoke County, North Carolina.

2.      Defendant Denis R. McDonough is the Secretary of the United States

Department of Veterans Affairs.

3.      As the Secretary of the United States Department of Veterans Affairs,

Mr. McDonough is the nominal party in interest in any suit, such as this one, asserting claims for the violation of civil rights against the United States Department of Veterans Affairs. 42 U.S.C. § 2000e-16(c).

4.      As described in greater detail below, this action asserts claims arising under both the Rehabilitation Act of 1973 and Title VII of the Civil Rights Act of 1964. As such, this court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

5.      Venue of this action in the United States District Court for the Eastern District of North Carolina ("Eastern District") is proper pursuant to 42 U.S.C. § 2000e-16(f)(3), in that, as herein alleged, the Eastern District of North Carolina is the district in which the unlawful employment practices at issue were committed, the district in which employment records relevant to such unlawful practices are maintained and/or administered, and the district in which the Plaintiff worked for the defendant.

## FACTUAL ALLEGATIONS

6.      Plaintiff Lamar Iron Horse ("Mr. Iron Horse") is a 48-year old, Native American (Indian) male, and is a former civilian employee of the U.S. Department of Veterans Affairs ("the VA" or "the Agency").

7.      Mr. Iron Horse began his employment with the VA on October 1, 2017.

8.     At the time of the events giving rise to this matter, Mr. Iron Horse was working full-time as a Medical Support Assistant ("MSA") in VA Health Administration Services ("HAS"), and was being paid at the GS-5, step 1 level.

9.     At the time of the events giving rise to this matter, Mr. Iron Horse's first-level supervisor was Ms. Teresa Shields, and his second-level supervisor was Mr. Jeffrey Todd Jarvis ("Jeff Jarvis").

10.     At the time of the events giving rise to this matter, Mr. Jarvis was the Chief of Care in the Community at the Fayetteville VA.

11.     In the Spring of 2018, Mr. Iron Horse's workplace at the VA was located on the 3rd floor of 201 Hay Street in Fayetteville, North Carolina.

12.     Mr. Iron Horse and other VA officials and employees refer to 201 Hay Street in Fayetteville, North Carolina as the "PWC" building.

13.     In late May or June of 2018, Mr. Iron Horse and several of his coworkers began smelling the strong odor of chemicals and gases while working on the 3rd floor of the PWC building.

14.     Upon information and belief, the chemicals and gases that Mr. Iron Horse and his co-workers were smelling while working in the PWC building were components of, and were being emitting (at least in part) by, building materials that were being used at the time to install a new roof on the PWC building.

15.     During the same period of time that Mr. Iron Horse was smelling,

- 3 -

breathing in and being exposed to the chemicals and gases that were in the air at the PWC building as a result of the roofing work, Mr. Iron Horse was also breathing in and being exposed to hazardous black mold spores that were found to be in the atmosphere of the PWC building.

16.     As a direct result of being exposed to the chemicals, gases and molds that were present in the PWC building, Mr. Iron Horse began to experience a number of adverse health consequences that he had not previously experienced before working at the VA, including, but not limited to: dizziness, loss of balance, burning eyes, head pressure, mental disorientation, slower thought processing, memory issues, visual changes, nosebleeds, the inordinate production of nasal mucous, loss of the sense of smell, coughing, shortness of breath, respiratory rattling, anxiety, panic attacks, and associated nausea and vomiting.

17.     As a result of these exposures, Mr. Iron Horse was subsequently diagnosed with acute and chronic sinus disease (chronic rhinosinusitis and allergic rhinitis), epitaxis, asthma, hyper-reactive airway disease, effusion in both ears, post-exposure lung nodules, and exposure-related stress and anxiety.

18.     After being exposed to and beginning to suffer adverse health effects from the chemicals, gases and molds that were present in the atmosphere of the PWC building, Mr. Iron Horse, in late May and June of 2018, made various complaints to Agency management about the presence of noxious fumes and

substances in the PWC building. However, in response to these complaints, Agency management took no direct steps to eliminate the noxious substances or odors from the area.

19.     Because he was having difficulty breathing and did not believe that anyone at the Agency was doing anything to address the problems being caused by the chemicals, gases and molds that were present in the atmosphere of the PWC building, on June 25, 2018, Mr. Iron Horse went to see Dr. Ismael Flores-Santiago, the Agency's Chief of Employee Occupational Health

20.     After speaking with Mr. Iron Horse on June 25, 2018, Dr. Flores-Santiago visited the affected work area himself and immediately detected the strong smell of chemicals in the air.

21.     After witnessing for himself the strong smell of chemicals in Mr. Iron Horse's work area in the PWC building, Dr. Flores-Santiago told Mr. Iron Horse that the area was unsafe; told Mr. Iron Horse that he needed to immediately get medical attention; and advised Mr. Iron Horse's supervisors to tell their employees that they too needed to seek medical evaluations, testing and treatment.

22.     On the recommendation of Dr. Flores-Santiago, Mr. Iron Horse filed a claim for workers' compensation, and, between July 9th and August 6th, 2018, was absent from work as a result of his workers' compensation claim.

23.     On August 6, 2018, Mr. Iron Horse returned to work at the Agency.

At that time, Agency management assigned Mr. Iron Horse and several of his coworkers to work in the basement of Building 4 of the VA Medical Center facility, located at 2300 Ramsey Street in Fayetteville, North Carolina ("Ramsey Street facility").

24.     Two days after returning to his job and being assigned to work in the basement of the Ramsey Street facility, Mr. Iron Horse, while at work, developed head pressure and a headache, his nasal passages swelled, his throat started to "close up" and he began gasping for air. Upon information and belief, this terrifying medical emergency, which occurred on August 8, 2018, was caused by the presence of mold and mildew in or near the basement of the Ramsey Street facility, and these substances had the effect of exacerbating the injuries that Mr. Iron Horse previously had sustained after being exposed to the chemicals, gases and mold in the PWC building.

25.     After experiencing the medical emergency caused by the presence of mold and mildew in or near the basement of the Ramsey Street facility on August 8, 2018, Mr. Iron Horse's medical doctors advised him not to return to work before September 12, 2018.

26.     On September 12, 2018, Michael Lishchynsky, PA-C, on behalf of Dr. Hari P. Saini, Mr. Iron Horse's worker's compensation healthcare provider, gave Mr. Iron Horse a note stating that although he was cleared to return to work,

because of the adverse effects of their environments on his health, Mr. Iron Horse should not be put to work in either the PWC building or the Ramsey Street facility.

27.    On September 13, 2018, Dr. Deidra Blanks, an Ear, Nose and Throat specialist who began treating Mr. Iron Horse after his initial exposure to chemicals and gases at the PWC building, also gave Mr. Iron Horse a note indicating that he would benefit from a change in his job location.

28.    On September 14, 2018, and based upon the medical recommendations of Dr. Blanks and Michael Lishchynsky, Mr. Iron Horse made a formal request of the Agency for a reasonable accommodation in the form of either a relocation or a transfer to a work location other than in the PWC building or the Ramsey Street location. This request was directly submitted to, received and acknowledged by Mr. Iron Horse's top-line supervisor, Jeff Jarvis, among other Agency officials, using official VA Forms 0857A and 0857b, respectively.

29.    Later in the day on September 14, 2018, Hurricane Florence made landfall in the State of North Carolina and caused wide-spread flooding in and around Fayetteville, North Carolina, and elsewhere.

30.    On September 18, 2018, and based upon the medical recommendations of Dr. Blanks and Michael Lishchynsky, Dr. Flores-Santiago also recommended -- directly to Mr. Iron Horse's top-line supervisor, Jeff Jarvis -- that Mr. Iron Horse be assigned to work in a location other than the PWC building

or the Ramsey Street facility -- such as in the VA's HCC facility in Fayetteville, North Carolina -- until Mr. Iron Horse's medical condition had sufficiently improved, according to his ENT and his worker's compensation doctors.[1]

31.     Later in the day on September 18, 2018, and despite Mr. Iron Horse's outstanding request for a reasonable accommodation that was supported by the recommendations of three different medical professionals, Jeff Jarvis -- who was not only Mr. Iron Horse's top-line supervisor, but also Chief of Care in the Community at the Fayetteville VA -- ordered Mr. Iron Horse to report to work in the basement of the Ramsey Street facility at 8:30 a.m. on September 19, 2018.

32.     Mr. Iron Horse dutifully did as he was told.

33.     Within hours of reporting back to work in the basement of the Ramsey Street facility on September 19, 2018, Mr. Iron Horse's throat again started to "close up;" he again began experiencing some of the same physical symptoms and problems that he had experienced after being exposed to mold, chemicals and gases while previously working in the PWC building (e.g., facial pain and pressure, headache, nosebleeds, difficulty breathing and swallowing); and he experienced a terrifying panic attack.  Mr. Iron Horse ultimately was carted out of the facility in a wheelchair.

34.     As with the medical emergency that he experienced on August 8, 2018

---

[1]     "HCC" is an abbreviation for the Agency's "Health Care Clinic" in Fayetteville.

shortly after returning to work at the Ramsey Street facility, the medical emergency that Mr. Iron Horse experienced at the Ramsey Street facility on September 19, 2018 was also caused by the presence of chemicals, mold and mildew in the basement of the Ramsey Street facility. Upon information and belief, these hazardous substances had the effect of exacerbating the injuries that Mr. Iron Horse had sustained after previously being exposed to chemicals, gases and mold in the PWC building.

35.    On September 24, 2018 and September 19, 2018, respectively, Dr. Blanks and Physician's Assistant Michael Lishchynsky provided the Agency with medical documentation to support Mr. Iron Horse's request and need for a reasonable accommodation in the form of a relocation or transfer to a work location other than in the PWC building or the Ramsey Street location.

36.    Dr. Raju Raval, Mr. Iron Horse's primary care provider, also provided supporting documentation on or about September 7, 2018.

37.    In a portion of her supporting medical documentation, Dr. Blanks explained that, because chemicals in Mr. Iron Horse's work environment were causing him to experience nasal congestion, facial pain and pressure, shortness of breath, headaches, nosebleeds, and difficulty swallowing and breathing, Mr. Iron Horse needed a reasonable accommodation in the form of a transfer to a different work location in order to decrease his risk of being exposed to the chemicals that

were causing his symptoms.

38.     Similarly, in a portion of his supporting medical documentation, Physician's Assistant Lishchynsky explained that, because chemicals, mold and mildew (among other things) in Mr. Iron Horse's workplace were causing him to experience moderate-to-severe breathing, speaking and cognitive difficulties while working in the Ramsey Street facility, Mr. Iron Horse needed a reasonable accommodation in the form of a relocation to a work location other than the Ramsey Street facility so that he could perform his work duties without experiencing any breathing, speaking or cognitive difficulties.

39.     On September 25, 2018, Mr. Iron Horse contacted an EEO Counselor at the Agency, and alleged that, by requiring him to work in the basement of Ramsey Street facility, and by refusing to grant his request for a reasonable accommodation, the Agency had discriminated against him on the basis of his race, sex and disability.

40.     On September 27, 2018, two days after Mr. Iron Horse initiated contact with an Agency EEO Counselor, the Agency sent Mr. Iron Horse an email message denying his request for a reasonable accommodation on the sole ground that "based upon the medical presented it doesn't qualify for reasonable accommodation."

41.     Upon information and belief, at the time of the Agency's refusal to

grant Mr. Iron Horse's request for a reasonable accommodation by relocating or reassigning him to work in a different location or position, there were at least six alternative work locations or positions at the Agency that were environmentally safe for Mr. Iron Horse.

42.    Upon further information and belief, at the time of the Agency's refusal to grant Mr. Iron Horse's request for a reasonable accommodation by relocating or reassigning him to work in a different location or position, there were at least six alternative work locations or positions at the Agency that Mr. Iron Horse was qualified to perform.

43.    Mr. Iron Horse is not the only employee of the Agency who was injured after being exposed to hazardous substances at the PWC and Ramsey Street locations, and thereafter requested a reasonable accommodation in the form of a relocation or transfer to a job position or work location other than one in the PWC or Ramsey Street location. For example:

      a. Sandra Freddie, an African-American female, also suffered breathing problems (and other medical issues) after being exposed to chemicals in the PWC building. At the time of the events at issue in this case, Ms. Freddie was employed as an Advanced Medical Support Assistant (GS-6), and, in response to two separate requests for the reasonable accommodation of moving her work

location to a place other than in the PWC building or the Ramsey Street facility, the Agency -- once in August and once in September, 2018 -- twice moved her to a work location that was not in the PWC building or the Ramsey Street facility.

b. Janetta Holliman, an African-American female, also suffered breathing problems (and other medical issues) after being exposed to chemicals in the PWC building, and thereafter filed a request for a reasonable accommodation in the form of a relocation to a work location other than in the PWC building. At the time of the events at issue in this case, Ms. Holliman was employed as a Medical Support Assistant (GS-6), and, in response to her request for a reasonable accommodation, was relocated to work in the Agency's occupational health department.

c. On August 28, 2018, and in response to her request for a reasonable accommodation, Fran McKnight, a female of unknown ethnicity, was reassigned by the Agency to work in a location other than the PWC building.

d. In September 2018, and in response to her request for a reasonable accommodation, Tanya Valdez, another female of unknown ethnicity, was offered a new position entirely in the Fayetteville

- 12 -

VA's HAS department.

44.     Notwithstanding the Agency's denial of Mr. Iron Horse's request for a reasonable accommodation on September 27, 2018, informal efforts to resolve Mr. Iron Horse's EEO concerns through the EEO counseling process continued.

45.     Meanwhile, in the immediate aftermath of Mr. Iron Horse's medical emergency and panic attack on September 19, 2018, Dr. Saini strongly advised the Agency to assign Mr. Iron Horse to work at a location other than the PWC or Ramsey Street facilities (such as the Agency's HCC facility on Raeford Road in Fayetteville, NC), and specifically instructed Mr. Iron Horse not to work in the PWC or Ramsey Street locations in order to keep him out of the environments that were "triggering" his medical issues.  In Dr. Saini's own words, these medical issues included, among other things, "difficulty breathing, clogged sinuses, tightening of the throat, and feeling like he was going to die."

46.     Because of Dr. Saini's orders for Mr. Iron Horse to stay away from the PWC and Ramsey Street locations, as reflected in a letter from Dr. Saini to the Agency, and because of the Agency's defiance of those orders by denying Mr. Iron Horse's request for a reasonable accommodation, Mr. Iron Horse did not, at any time after suffering a terrifying medical emergency on September 19, 2018, report to work at the Ramsey Street facility, and the Agency did not instruct or assign him to work anywhere else.

- 13 -

47.     On December 19, 2018, after informal efforts to resolve Mr. Iron Horse's claims of discrimination had failed, the Agency's EEO Counselor issued a letter terminating the counseling process and advising Mr. Iron Horse, inter alia, that, if he desired to do so, he had a right to file with the EEOC a formal complaint of discrimination against the Agency within 15 days of his receipt of the letter terminating the counseling process.

48.     On January 2, 2019, Mr. Iron Horse timely filed with the EEOC a formal complaint of discrimination against the Agency.

49.     Notwithstanding its clear awareness of the health-related reasons for Mr. Iron Horse's absence from work at the Ramsey Street facility between September 20, 2018 and February 13, 2019 -- during which time the Agency took no steps to transfer or assign Mr. Iron Horse to work at any location other than the Ramsey Street facility  -- on February 13, 2019, the Agency sent Mr. Iron Horse a letter terminating his employment on the asserted grounds that he was absent without leave and had failed to follow proper leave-requesting procedures.

50.     Because the Agency's February 13, 2019, termination letter was not addressed to Mr. Iron Horse correct address, Mr. Iron Horse did not receive the letter terminating his employment (or any other official notice of his termination from the Agency) until July or August of 2019, when a copy of the letter was obtained and later provided to him by the EEO Investigator who was assigned to

investigate his complaint of discrimination.

51.     On March 18, 2019, the VA's Office of Resolution Management issued a Notice of Acceptance of Mr. Iron Horse's EEO Complaint.

52.     On April 16, 2019, the VA's Office of Resolution Management issued a Revised Notice of Acceptance of Mr. Iron Horse's EEO Complaint.

53.     On June 7, 2019, the VA's Office of Resolution Management assigned an EEO Investigator to investigate Mr. Iron Horse's discrimination complaint.

54.     On or about August 20, 2019, Mr. Iron Horse amended his discrimination complaint to include an allegation that he had been wrongfully terminated by the Agency.

55.     After multiple extensions of time to complete the investigation, an EEO Report of Investigation was issued on December 6, 2019.

56.     On December 27, 2019, Mr. Iron Horse officially requested the appointment of an EEOC administrative judge to hear his complaint of discrimination against the Agency.

57.     On January 2, 2020, the U.S. Equal Employment Opportunity Commission issued an order acknowledging the filing of Mr. Iron Horse's discrimination complaint, and assigning the following case number to the complaint: EEOC No. 430-2020-00154X.

58.     On February 21, 2020, the Honorable Angelo Mathay, administrative

judge, issued a Scheduling Order which set June 17, 2020, as the discovery cutoff date, and July 2, 2020, as the dispositive motion/summary judgment cutoff date.

59. The discovery and dispositive motion cutoff dates were subsequently extended by Judge Mathay to July 20, 2020 and August 4, 2020, respectively.

60. Since the passage of these discovery and dispositive motion cutoff dates, the EEOC has not -- despite multiple requests from Mr. Iron Horse and his counsel to do so -- conducted a hearing to address Mr. Iron Horse's claims of discrimination.

61. Nor has the EEOC, as of the filing of this lawsuit, even set a date for a hearing to address Mr. Iron Horse's claims of discrimination.

62. On October 2, 2020, Mr. Iron Horse, by and through undersigned counsel, filed with the EEOC a motion for partial summary judgment on the issues of whether the Agency unlawfully discriminated against Mr. Iron Horse on the bases of his disability and his gender, in violation of the Rehabilitation Act of 1973 and Title VII of the Civil Rights Act of 1964.

63. In spite of the fact that the Agency has not filed an opposition to Mr. Iron Horse's motion for partial summary, to date, the EEOC has not -- despite multiple requests from Mr. Iron Horse and his counsel to do so -- held a hearing or otherwise ruled upon Mr. Iron Horse's motion partial summary judgment.

64. Based upon the foregoing, more than 180 days since the initial filing

of Mr. Iron Horse's charge of discrimination have elapsed, and, to date, neither the Agency, nor the EEOC has taken final action on Mr. Iron Horse's complaint. As such, this matter is now ripe for a civil action as provided in 29 U.S.C. § 794a and 42 U.S.C. § 2000e-16(c).

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the Rehabilitation Act of 1973 – 29 U.S.C. § 791, et seq.)

65.     The allegations of Paragraphs 1 through 64 of this Complaint are re-alleged and incorporated herein by reference.

66.     The Rehabilitation Act of 1973 ("the Act"), 29 U.S.C. § 791, et seq., imposes upon federal agencies an affirmative duty concerning the treatment of disabled applicants and employees.

67.     Section 504 of the Act, codified at 29 U.S.C. § 794, provides, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ."

68.     The standards used to determine whether there has been a violation of 29 U.S.C. § 794 are the same standards that are applied to determine whether there has been a violation of Title I of the Americans with Disabilities Act of 1990. 29 U.S.C. § 794(d).

- 17 -

69.     Under Title I of the Americans with Disabilities Act of 1990 (the "ADA"), employers are prohibited from discriminating against qualified individuals with a disability. 42 U.S.C. § 12112(a).

70.     "Discrimination" under the ADA includes, but is not limited to, the failure of an employer to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]."

71.     The facts of this case establish, and the Agency admits, that Mr. Iron Horse is "a qualified individual with a disability."

72.     The facts of this case also establish, and the Agency admits, that, with full knowledge of Mr. Iron Horse's status as a qualified individual with a disability, the Agency failed and refused to offer or provide Mr. Iron Horse with a reasonable workplace accommodation despite being repeatedly asked to do so.

73.     Instead of offering or providing Mr. Iron Horse with a reasonable workplace accommodation, the Agency constructive discharged and/or wrongfully terminated Mr. Iron Horse from his employment with the Agency.

74.     The Agency has not alleged, contended, or provided any evidence to support an allegation or contention that: (a) the accommodation requested by Mr. Iron Horse was unreasonable; (b) the accommodation requested by Mr. Iron Horse

- 18 -

would have imposed an undue hardship on the operations of the Agency; or (c) the Agency had a legitimate, non-discriminatory reason for denying Mr. Iron Horse's request for a reasonable accommodation.

75.    Accordingly, by failing to make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability -- to wit, Mr. Iron Horse – and by constructively discharging and/or directly terminating Mr. Iron Horse's employment, the Agency has violated the Rehabilitation Act of 1973.

76.    As a direct, proximate and foreseeable result of the Agency's violation of the Act, Mr. Iron Horse was subjected to environmentally hazardous working conditions; these conditions caused, contributed to, and exacerbated a variety of severe and disabling medical conditions; and Mr. Iron Horse has been damaged. He has suffered, and is continuing to suffer, severe, painful, and permanent physical and emotional injuries, including damage to his reputation, embarrassment, humiliation, anxiety, depression and severe emotional distress.  He has suffered and is continuing to suffer great pain of body and mind.  He has received hospital and medical care and treatment for his injuries, will require additional medical care, attention and treatment in the future, and has incurred, and will continue to incur, substantial expenses for such hospital and medical care, attention and treatment.

77.     As a further direct, proximate and foreseeable result of the Agency's misconduct, Mr. Iron Horse has lost wages in the past, and is permanently disabled from performing his usual activities and occupational duties, with a resulting loss of future earnings and enjoyment of life.

78.     As remedies for the Agency's violation of the Act, Mr. Iron Horse is entitled to an award of back pay, front pay, compensatory damages, attorney's fees, and other forms of equitable relief in an amount and/or a form to be proven at trial.

**COUNT II**
**(Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2)**

79.     The allegations of Paragraphs 1 through 78 of this Complaint are re-alleged and incorporated herein by reference.

80.     Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2.

81.     The Agency violated Title VII with respect to Mr. Iron Horse when, in response to multiple requests for health-related transfers or assignments to new jobs or work locations, the Agency transferred several of Mr. Iron Horse's female co-workers to new jobs or work locations but refused to do either of those things for Mr. Iron Horse.

82.     The Agency also violated Title VII by constructively discharging

- 20 -

and/or wrongfully terminating Mr. Iron Horse from his employment with the Agency.

83.     As a direct, proximate and foreseeable result of the Agency's violation of Title VII with respect to Mr. Iron Horse, Mr. Iron Horse was subjected to environmentally hazardous working conditions; these conditions caused, contributed to, and exacerbated a variety of severe and disabling medical conditions; and Mr. Iron Horse has been damaged. He has suffered, and is continuing to suffer, severe, painful, and permanent physical and emotional injuries, including damage to his reputation, embarrassment, humiliation, anxiety, depression and severe emotional distress.  He has suffered and is continuing to suffer great pain of body and mind.  He has received hospital and medical care and treatment for his injuries, will require additional medical care, attention and treatment in the future, and has incurred, and will continue to incur, substantial expenses for such hospital and medical care, attention and treatment.

84.     As a further direct, proximate and foreseeable result of the Agency's misconduct, Mr. Iron Horse has lost wages in the past, and is permanently disabled from performing his usual activities and occupational duties, with a resulting loss of future earnings and enjoyment of life.

85.     As remedies for the Agency's violation of Title VII, Mr. Iron Horse is entitled to an award of back pay, front pay, compensatory damages, attorney's fees,

and other forms of equitable relief in an amount and/or a form to be proven at trial.

**WHEREFORE,** Plaintiff prays for relief as follows:

1. That, as to Count I of this Complaint, Plaintiff Lamar Iron Horse have and recover from the defendant an award of back pay, front pay, compensatory damages, attorney's fees, and other forms of equitable relief in an amount and/or a form to be proven at trial.

2. That, as to Count I of this Complaint, Plaintiff Lamar Iron Horse have and recover from the defendant an award of back pay, front pay, compensatory damages, attorney's fees, and other forms of equitable relief in an amount and/or a form to be proven at trial.

3. That the costs of this action be taxed against the defendant.

4. That this case have a **Trial By Jury** on all issues so triable.

5. That Plaintiff Lamar Iron Horse be granted such other and further relief as the Court deems just and proper.

This the 25th day of January, 2022.

LAW OFFICES OF WILLIE D. GILBERT, II

By: /s/ Willie D. Gilbert, II
    Willie D. Gilbert, II
    Attorney for the Plaintiff
    N.C. State Bar No. 17406
    P.O. Box 4522
    Wilson, NC 27893
    Tel: (252) 299-3391
    Email: wgilbertlaw@aol.com

- 22 -

## **VERIFICATION**

I, Lamar Iron Horse, hereby verify and declare, under penalty of perjury, that I am the Plaintiff in the above-captioned action, and that the statements set forth in the foregoing Complaint are true and correct to the best of my knowledge and belief, except for those matters set forth upon information and belief, and, as to those matters, I believe them to be true and correct.

Executed this _25th_ day of January, 2022.

Lamar Iron Horse